IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

SUSAN MARY MENCKE,

               Plaintiff,

    vs.

COMMISSIONER OF SOCIAL
SECURITY,

           Defendant.

)
)
)
)
)
)
)
)
)
)

CASE NO. 1:21-CV-2298


MAGISTRATE JUDGE
JONATHAN D. GREENBERG


**MEMORANDUM OF OPINION AND
ORDER**

      Plaintiff, Susan Mary Mencke ("Plaintiff" or "Mencke"), challenges the final decision of

Defendant, Kilolo Kijakazi,[1] Commissioner of Social Security ("Commissioner"), denying her application

for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§

416(i), 423, and 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the

consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the

Commissioner's final decision is AFFIRMED.

## I. PROCEDURAL HISTORY

      In December 2015, Mencke filed an application for SSI, alleging a disability onset date of January

1, 2003 and claiming she was disabled due to: degenerative disc disease in her lumbar and cervical spine,

fibromyalgia, osteoarthritis in her right knee, left carpal tunnel syndrome, and depression.  Transcript

("Tr.") at 226, 256.  Her application was denied initially and upon reconsideration.

      Mencke has had three rounds of hearings and decisions by two different ALJs.  Her first hearing

was on October 25, 2017 (Tr. 72-107) and an ALJ issued an unfavorable decision on March 7, 2016 (Tr.

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

15-30).  Mencke appealed to federal court, the parties stipulated to a remand, and the district court reversed.  Tr. 968-969.  Mencke's next hearing was on October 23, 2019 (Tr. 875-912) and the same ALJ issued a partially favorable decision on November 21, 2019, finding that Mencke was disabled as of August 12, 2019.  Tr. 855-868.  Mencke appealed to federal court, the parties stipulated to a remand, and the district court reversed.  Tr. 1724.  Her third hearing was on September 22, 2021 before a new ALJ (Tr. 1701-1723) and an ALJ issued an unfavorable decision on October 4, 2021, again finding that Mencke was not disabled prior to August 12, 2019 (Tr. 1669-1693).

On December 8, 2021, Mencke filed her Complaint to challenge the Commissioner's final decision.  Doc. No. 1.  The parties have completed briefing in this case.  Doc. Nos. 9, 13, 14.  Mencke asserts the following assignments of error:

> 1. The ALJ erroneously failed to follow the remand orders of the Appeals Council pursuant to stipulated Orders of Remand by this Court.
>
> 2. The ALJ erred when he failed to properly consider all Mencke's impairments and symptoms and failed to support the RFC with substantial evidence when he limited her to work at the light level of exertion.

Doc. No. 9, p. 1.

## II. EVIDENCE

### A.     Personal and Vocational Evidence

Mencke was born in 1965 and was 50 years old on the date the application was filed.  Tr. 1692. She has at least a high school education and no past relevant work.  Tr. 1692.

### B.     Relevant Medical Evidence[2]

#### 1. Evidence dated before Mencke's disability date of August 12, 2019

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' briefs and covers the relevant time period, November 2015 through August 2019.  In addition, the Court notes that Mencke's counsel did not comply with the Court's Initial Order, which states, "Any facts recited in support of the Argument section of the brief must also be set forth in the Facts section of the brief."  Doc. No. 4, p. 3.  Counsel has been warned about this practice before.  *See, e.g.*, Case No. 4:21-cv-1038, Doc. No. 15, p. 3, n. 3 (filed 4/6/2022). Counsel's failure to follow the Court's briefing order may result in a court striking portions of her brief that are non-compliant.

On February 25, 2016, Mencke saw psychologist Brian Griffiths, Psy.D., for a consultative exam. Tr. 690-696. She denied having been psychiatrically hospitalized and any involvement with the mental health system. Tr. 693. She described her daily activities: she gets up at 7:00 a.m., helps her children get ready for school, sometimes watches TV, reads, and gets together with friends, and she prepares meals and grocery shops. Tr. 693. Upon exam, she was polite and cooperative, displayed adequate hygiene and grooming, and appeared to be a somewhat depressed person. Tr. 693. She had normal speech, reactive affect, no anxiety, and manifested no indications of obsessions, compulsions, delusions, or hallucinations. Tr. 694. She was alert and responsive, her remote recall was adequate, and she performed simple math functions. Tr. 694. She exhibited sufficient judgment. Tr. 694. Dr. Griffiths diagnosed unspecified depressive disorder. Tr. 694. He wrote that Mencke could manage personal funds, she had low-average intelligence, performed poorly on a test to measure short-term memory skills (serial sevens and counting backwards), and she understood and followed simple instructions during the evaluation. Tr. 695. She followed the conversation adequately during the evaluation and her comments suggested that her ability to focus decreased with pain. Tr. 695. She worked at an adequate rate during the evaluation but her depression may interfere with her ability to keep up with others. Tr. 696. She interacted appropriately but appeared to be depressed. Tr. 696. Finally, her comments suggested that stressful situations exacerbate her depressive symptoms including low mood and social withdrawal. Tr. 696.

On December 16, 2016, Mencke had a follow-up for urinary problems at Southwest Urology. Tr. 717. She was having urinary frequency after having run out of her medication three weeks prior. Tr. 717. She denied chronic back pain, neck pain, sore muscles, and symptoms in all other body systems; was unremarkable upon exam; and she had a normal gait and station. Tr. 718-719. Her medication was reordered. Tr. 719.

On May 11, 2017, Mencke saw pain management physician Emad Daoud, M.D., for an evaluation.  Tr. 722-724.  She had been diagnosed with cervical radiculopathy, brachial neuritis, and fibromyalgia.  Tr. 722.  She complained of neck pain (rated 9/10) radiating to her right shoulder down to her fingers and numbness and tingling in her right upper extremity as well as in two fingers on her left hand.  Tr. 724.  She reported some right arm weakness, denied gait disturbances, and endorsed bilateral knee pain.  Tr. 724.  Upon exam, she had limited range of motion in her cervical spine due to pain, some diffuse tenderness in her cervical muscles, and positive trigger points in her shoulder muscles.  Tr. 724. Her motor function in her upper extremities was 4-5/5.  Tr. 724.  She had slight loss of sensation to light touch on an area of her right forearm and intact deep tendon reflexes.  Tr. 724.  Dr. Daoud reordered her medication and ordered a cervical epidural injection and physical therapy.  Tr. 724.  On June 8, Mencke had a cervical epidural block and had unremarkable physical examination findings, including 5/5 strength in her arms and legs.  Tr. 731.

On August 1, 2017, Mencke returned to Dr. Daoud in pain management and reported that her symptoms had been worse since her injection.  Tr. 762.  Her pain was rated 10/10 and was located in the right side of her neck and right shoulder and radiated to her right arm.  Tr. 764.  She also reported pain in her lower back, bilateral knees, and bilateral ankles.  Tr. 764.  Her muscular skeletal exam was described as "essentially unchanged" from her last visit in May.  Tr. 764.  Dr. Daoud recommended an MRI of her neck.  Tr. 764.

On August 25 and September 22, 2017, Mencke had appointments at Neighborhood Family Practice for chronic care management for hypoglycemia.  Tr. 813, 810.  Upon exam, she had normal range of motion in her neck, normal range of motion in her arms and legs, no swelling or tenderness in her arms and legs, and her behavior was described as normal.  Tr. 815, 811.

4

On September 19, 2017, Mencke returned to Dr. Daoud's office for a follow up.  Tr. 825.  She reported neck pain radiating to both hands, numbness in her hands, and back pain radiating to her hips.  Tr. 826.  Upon exam she walked without an assistive device, had normal muscle tone and intact strength and sensation, negative straight leg raise testing, tenderness in her lumbar area and the left side of her trapezius muscle, and full range of motion in her back and neck.  Tr. 827.  A lumbar MRI showed degenerative changes at the lower lumbar levels with mild right foraminal narrowing at L5/S1.  Tr. 1265-1266.

Meanwhile, on May 24, 2017, Mencke went to North Shore Gastroenterology for her dysphagia and GERD.  Tr. 784.  Additional medical problems listed were fibromyalgia, arthritis, stress incontinence, asthma, and high blood pressure.  Tr. 784.  An upper GI endoscopy on August 31 was "suspicious for short-segment Barrett's esophagus."  Tr. 787.

On October 17, 2017, Mencke had a behavioral health assessment at Neighborhood Family Practice.  Tr. 799.  She reported being more irritable without her depression medication.  Tr. 799.  Her goal was to decrease her anxiety.  Tr. 798.  She reported an irritable mood, sleep disturbance, feelings of restlessness, and frequent headaches.  Tr. 800.  She was diagnosed with major depressive disorder, recurrent, moderate, and generalized anxiety disorder.  Tr. 803.  She was prescribed medication and counseling.  Tr. 803.

On March 22, 2018, Mencke visited Neighborhood Family Practice for a follow-up.  Tr. 1130.  Upon exam she had normal range of motion, no tenderness or edema, and normal behavior.  Tr. 1132.

On May 8, 2018, Mencke saw rheumatologist Bassam Alhaddad, M.D., for her complaints of knee pain.  Tr. 1100.  Upon exam she had normal motor strength and sensation in her arms and legs, intact sensation, no swelling, normal range of motion without any tenderness throughout her body, and bilateral knee crepitus.  Tr. 1101.  She received a right knee injection.  Tr. 1100.

5

On June 28, 2018, Mencke had a follow-up for her urinary issues.  Tr. 1070.  She reported that she was getting up more than five times per night to urinate but was happy with her current medication and wanted a refill.  Tr. 1070.  She explained that her other medications made her thirsty, causing her to drink more fluids.  Tr. 1070.  Upon exam, she had a normal gait and station and used a cane.  Tr. 1072. The next day she had a follow-up at Neighborhood Family Practice.  Tr. 1143.  Her provider told her that her bone density scan performed on May 7 was normal.  Tr. 1143, 1286.  Upon exam she had a normal range of motion in her neck, normal range of motion in her arms and legs and no swelling or tenderness, and normal psychiatric behavior.  Tr. 1144.

A modified barium swallow test on August 31, 2018, did not reveal any obstruction.  Tr. 1403-1404.  On October 30, she returned to North Shore Gastroenterology.  Tr. 1506.  Her GERD was "completely asymptomatic."  Tr. 1506.

On October 2, 2018, Mencke returned to Neighborhood Family Practice for a follow-up.  Tr. 1159.  Her fibromyalgia was doing "fairly well at this time," her pain was "relatively controlled," and weather changes made it worse.  Tr. 1159.  Upon exam, she had normal range of motion in her neck, normal range of motion in her arms and legs, no swelling or tenderness in her arms and legs, and she had normal behavior.  Tr. 1160.  On October 8 she saw Dr. Alhaddad.  Tr. 1097.  Her pain was better with medication but her right knee was buckling and she reported still having problems with her right hip. Tr. 1097.

On January 3, 2019, Mencke visited Neighborhood Family Practice.  Tr. 1176.  She reported fatigue, back pain, and neck pain.  Tr. 1177.  Upon exam, she had normal range of motion in her neck, arms, and legs, no swelling or tenderness in her arms and legs, and normal behavior.  Tr. 1177-1178. On January 7 she had a follow-up with Dr. Alhaddad.  Tr. 1094.  Upon exam she had no synovitis in her hands or wrists, normal range of motion in her shoulders and hips, normal knees, tenderness in her right

lumbosacral area, no hip, knee or ankle tenderness, and her knees were cool without effusion.  Tr. 1095-1096.

On March 8, 2019, x-rays of Mencke's knees showed moderate to severe bilateral patellofemoral osteoarthritis and mild bilateral tibiofemoral osteoarthritis.  Tr. 1248.

On April 4, 2019, Mencke visited Neighborhood Family Practice.  Tr. 1195.  She had a normal range of motion in her neck, no swelling or tenderness in her arms and legs, and her behavior was normal.  Tr. 1196.  On April 8 she saw Dr. Alhaddad complaining of right knee pain and endorsing headaches.  Tr. 1085, 1086.  Upon exam she had no synovitis in her hands or wrists, normal range of motion in her shoulders and hips, tenderness in her right lumbosacral area, no hip or ankle tenderness, and her knees were cool without effusion with joint line tenderness in her right knee.  Tr. 1089.  Dr. Alhaddad's assessment was seronegative rheumatoid arthritis of multiple sites, primary osteoarthritis of the right knee, spondylosis of lumbar region without myelopathy or radiculopathy, and primary osteoarthritis of the left knee.  Tr. 1085.

On July 16, 2019, Mencke saw Dr. Alhaddad and reported having fallen twice within the past two weeks.  Tr. 1079.  Her exam findings were as her prior visit.  Tr. 1083.

On August 9, 2019, Mencke had a physical therapy evaluation for right knee and leg pain.  Tr. 1339.  "She presents with impairments of postural deviations, gait deviations, difficulty with transfers, fall risk, decreased balance, decreased hip strength and pain."  Tr. 1339.  She reported difficulty with all her activities of daily living and self-care.  Tr. 1339.

### 2.  Evidence dated on or after Mencke's disability date of August 12, 2019

On August 12, 2019, a walker was prescribed to Mencke due to right leg instability and weakness.  Tr. 1310.

On September 26, 2019, an MRI of Mencke's right knee showed moderate patellofemoral osteoarthritis.  Tr. 1246-1247.  A nerve conduction study and EMG for bilateral carpal tunnel syndrome were positive for a right median nerve sensory axonal neuropathy across her right wrist consistent with mild entrapment neuropathy.  Tr. 1655-1657.

On October 2, 2019, Mencke visited a provider who described her right knee MRI as showing advanced degenerative changes.  Tr. 1299.

On September 17, 2021, Dr. Alhaddad completed a Physical Medical Source Statement on behalf of Mencke.  Tr. 1884-1887.  He stated that he had been treating her since May 2018.  Tr. 1884.  He opined that she could sit four hours in an eight-hour workday and stand/walk for two hours; she would be absent more than four days per month and off task 25% or more per day; she could occasionally lift less than ten pounds and never more; she required an assistive device due to pain; and she would need one-to-two unscheduled breaks per day.  Tr. 1884-1887.

## C.      State Agency Reports

On January 19, 2016, William Bolz, M.D., reviewed Mencke's record and, regarding her residual functional capacity, opined that it had not changed from a prior ALJ decision finding that she could perform work at the light exertional level: she could lift and carry 20 pounds occasionally and 10 pounds frequently, stand/walk and sit six hours during a workday with the option to alternate between sitting and standing every hour for five minutes without leaving the work station; occasionally bend, stoop, and climb ramps and stairs; never kneel or crawl; could reach in front and frequently overhead; could handle, finger, and feel with her dominant (right) hand and occasionally with her left hand; and must avoid exposure to hazardous conditions and must try to avoid extreme temperatures.  Tr. 137, 116.  On June 26, 2016, Robert Wysokinski, M.D., affirmed Dr. Bolz's opinion.  Tr. 154-155.

8

On March 9, 2016, Courtney Zeune, Psy.D., reviewed Mencke's record and opined that she had mild difficulties in maintaining social functioning, mild restrictions of activities of daily living, moderate difficulties in maintaining concentration, persistence or pace, and no repeated episodes of decompensation for extended durations.  Tr. 135.  She wrote that Mencke could understand and remember very short and simple tasks, could carry out very short and simple instructions in a setting without demands for sustained rapid pace or meeting strict production quotas, and could adapt to a work setting with occasional minor changes in routine.  Tr 138-139.  On May 15, 2016, Karla Voyten, Ph.D., affirmed Dr. Zeune's opinions.  Tr. 152, 155-156.

## C.    Hearing Testimony

During the September 22, 2021 hearing, Mencke testified to the following:

- She lives with her boyfriend and three children, two of whom are minors.  Tr. 1708.  She has a driver's license and is able to drive but she hasn't done so in years because she doesn't have a car.  Tr. 1709.

- When asked what a typical day was like for her between November 2015 and August 2019, she stated that she did not remember because she has a very short-term memory.  Tr. 1710.

- When asked how long she was able to stand at one time between 2016 and 2019, she answered that she could stand for no more than 4 hours at a time, with periodic breaks that lasted an hour.  Tr. 1711.  Without breaks she could stand for 20 minutes.  Tr. 1711.  She has no difficulty getting along with others.  Tr. 1711.

- When asked what her biggest challenge was working between 2016 and 2019, she stated that she got fatigued very easily.  Tr. 1712.  Walking, standing and sitting caused fatigue.  Tr. 1712.  She did not take naps during the day then, although she does now.  Tr. 1712.

- When asked if her conditions have gotten worse since 2019, she stated that they have gotten worse.  Tr. 1712.  She walks with a rollator walker because she never knows when her right leg is going to give out.  Tr. 1712-1713.  When asked about her hands, she stated that her hand pain has gotten worse and there are times she is unable to type on her phone.  Tr. 1713.  She is right-handed; that's the hand affected the most.  Tr. 1713.

The ALJ stated that Mencke had no past relevant work and asked the VE whether a hypothetical individual with the same age and education as Mencke with no past relevant work could perform work if the individual had the limitations assessed in the ALJ's RFC determination, described below.  Tr. 1714-

1715.  The VE answered that such an individual could perform the following representative jobs in the economy: school bus monitor, rental clerk, and shelving clerk.  Tr. 1715.

### III. STANDARD FOR DISABILITY

A disabled claimant may be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience.  *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

10

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant did not engage in substantial gainful activity from November 5, 2015 (application date) to August 12, 2019 (20 CFR 416.971 *et seq*.).

2. The claimant has the following severe impairments from November 5, 2015 to August 12, 2019: obesity; seronegative rheumatoid arthritis; degenerative disc disease (cervical and lumbar spine); degenerative joint disease; gastrointestinal reflux disease; depression; and anxiety disorder (20 CFR 416.920(c)).

3. The claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, I find that, for the period from November 5, 2015 to August 12, 2019, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except climb ramps and stairs occasionally; never climb ladders, ropes, or scaffolds; stoop or kneel occasionally; never crouch or crawl; never work at unprotected heights or near dangerous moving machinery; occasionally work in extreme cold and extreme heat; must alternate between sitting and standing for 5 minutes every hour without being off task; occasionally handle, finger, and feel with the non-dominant hand; frequent reaching overhead bilaterally; can understand, remember, carry out, and complete simple tasks with no strict production rate pace requirements; and can adapt to occasional and routine workplace changes.

5. The claimant has no past relevant work (20 CFR 416.965).

6. The claimant was born on April **, 1965 and was 50 years old, which is defined as an individual closely approaching advanced age, on the date the application was filed (20 CFR 416.963).

7. The claimant has at least a high school education (20 CFR 416.964).

8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

10. The claimant has not been under a disability, as defined in the Social Security Act, for the period from November 5, 2015 (application date) to August 12, 2019 (20 CFR 416.920(g)).

Tr. 1669-1693.

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir.2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.").  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D.Ohio July 9, 2010).

## VI. ANALYSIS

### A. The ALJ did not fail to follow the remand order

Mencke argues that the ALJ erred because he failed to follow the remand order issued by the Appeals Council. Doc. No. 9, p. 9. The Appeals Council's remand order states,

> The hearing decision does not resolve all of the conflicts between the vocational expert's testimony and the Dictionary of Occupational Titles (DOT) and thus does not properly support denial at Step 5. For the period before August 12, 2019, the hearing decision indicates that the claimant has the residual functional capacity to perform a range of light work as defined in 20 CFR 416.967(b) with, among other limitations, occasional overhead reaching bilaterally, and occasional reaching, fingering, and feeling with the non-dominant hand (Decision, page 8). The DOT does not address overhead reaching or address limits with one extremity. In response to a hypothetical based on the residual

functional capacity, the vocational expert cited the following representative occupations that the claimant could perform: rental clerk (295.367-026), office helper (239.567-010), and parking lot attendant (915.473-010), all of which require frequent reaching and handling per the DOT, and two that require frequent fingering. The vocational expert did not explain how the claimant could perform the jobs with the reaching, handling, and fingering limitations as articulated (2019 Hearing Transcript, pages 20-37)…

Upon remand the Administrative Law Judge will:

Obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base (Social Security Ruling 83-14). The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole. The Administrative Law Judge will ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy (20 CFR 416.966). Further, before relying on the vocational expert evidence the Administrative Law Judge will identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles (DOT) and its companion publication, the Selected Characteristics of Occupations (Social Security Ruling 00-4p).

Tr. 1728-1729.

Mencke concedes that the Appeals Councils "ordered a different ALJ to hold a hearing and resolve all the conflicts between the vocational testimony and the Dictionary of Occupational Titles (DOT)." Doc. No. 9, p. 9; Doc. No. 14, p. 1.  She asserts, "the ALJ failed to comply with the remand order in this matter when he misconstrued the evidence regarding the fact that her dominant right arm was worse than the left." Doc. No. 9, pp. 10-11.  She complains that the ALJ limited her to occasional handling, fingering, and feeling with the non-dominant hand "but her right hand was worse than the left." Doc. No. 9, p. 10; Doc. No. 14, p. 2.[3]

The Appeals Council did not order the ALJ to reevaluate whether Mencke's right hand was worse than her left hand.  Rather, the Appeals Council ordered the ALJ to resolve conflicts between the VE testimony and the DOT.  That is what the ALJ did.  The ALJ's hypothetical included the same limitation as the prior hearing—occasional handling, fingering and feeling with the non-dominant hand—and the VE explained that the DOT does not account for an occasional handling, fingering and

---

[3]  In an undated Function Report, Mencke stated that she uses a brace on her left hand for carpal tunnel syndrome.  Tr. 270.  She also alleged disability based on "Left Carpal Tunnel Syndrome."  Tr. 256.

feeling limitation with one hand.  Tr. 1714-1715.  The DOT only accounts for occasional handling, fingering and feeling bilaterally.  Tr. 1715.  The VE identified jobs that required occasional handling, fingering and feeling bilaterally, which, he stated, would also "clearly be appropriate" for a person who was limited to occasional handling, fingering and feeling with one hand: school bus monitor, rental clerk, and shelving clerk.  Tr. 1715.  Thus, the ALJ complied with the remand order when he held a hearing and resolved conflicts between the VE testimony and the DOT regarding the one-handed occasional handling, fingering and feeling limitation.

The Court finds that Mencke has not identified an error made by the ALJ with respect to the Appeals Council's remand order.

### B.  Mencke has not identified an error in the ALJ's decision

Mencke writes, "The ALJ erred when he failed to properly consider all Mencke's impairments and symptoms and failed to support the RFC with substantial evidence when he limited her to work at the light level of exertion."  Doc. No. 9, p. 11.  That issue can be broken down into eight categories, described below.[4]

### 1.  Light work

Mencke writes, "it is unclear from the record how the ALJ determined that Mencke could perform work at the light level of exertion on a full-time and sustained basis."  Doc. No. 9, p. 11.  She spends over two pages recounting medical evidence[5] and concludes, without further ado, "This evidence established that Mencke was unable to stand/walk the requisite 6 hours for work at the light level of

---

[4]  Mencke's counsel has been warned about presenting discrete substantive arguments under one vague heading, a practice she continues here.  *See, e.g.*, Case No. 1:21-cv-01507, Doc. No. 14, p. 20, n.3 (filed 5/3/2022); Case No. 1:21-cv-00556, Doc. No. 19, p. 34, n.7 (filed 3/2/2022); Case No. 5:20-cv-02850, Doc. No. 19, p. 34, n. 5 (filed 2/2/2022); Case No. 5:21-cv-01721, n. 5 (filed 4/14/2022); see also Case No. 5:20-cv-01340, Doc. No. 21, p. 26, n. 9 (filed 8/16//2021); Case No. 1:20-cv-01186, Doc. No. 21, p. 25, n. 8 (filed 8/16/2021).  Counsel's failure to present arguments in a way that the Court can address them, and Defendant can respond to them, may result, in the future, in the Court deeming an argument to be improper and/or declining to grant a requested page extension.

[5]  Some of the evidence Mencke cites in support was not in the facts section of her brief in violation of the Court's Initial Order.

exertion."  Doc. No. 9, p. 14.  Because Mencke recites medical evidence without tying any of it to a legal argument describing what she believes the ALJ got wrong, the Court finds that she has waived her argument that the ALJ erred when finding that she can perform light work.  *See McPherson v. Kelsey*, 125 F.3d 989, 995–996 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (internal citations omitted).

## 2. Fibromyalgia

Mencke argues that the ALJ erred when he found that her fibromyalgia was not a medically determinable impairment.  Doc. No. 9, p. 14.  Pursuant to SSR 12-2p, there are two ways a claimant can show that fibromyalgia is a medically determinable impairment: (1) a history of widespread pain that has persisted for at least three months, at least 11 positive tender points on physical examination, which must be found bilaterally and above and below the waist, and evidence that other disorders that could cause the symptoms or signs were excluded; or (2) a history of widespread pain, repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions, especially fatigue, cognitive or memory problems, waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome, and evidence that other disorders that could cause these repeated manifestations of symptoms, signs, or co-occurring conditions were excluded.  2012 WL 3104869, at *2-3 (July 25, 2012).  Here, the ALJ found that fibromyalgia was not a medically determinable impairment because the evidence failed to establish that Mencke had the requisite number of tender points and comorbidities and that the evidence indicated there were other "etiologies for the nature of her symptoms, including musculoskeletal impairments and rheumatoid arthritis."  Tr. 1674 (citing SSR 12-2p).  Thus, the ALJ found that, under either approach, Mencke's fibromyalgia was not a medically determinable impairment.

Mencke argues that the evidence shows that she had been diagnosed with fibromyalgia and that she had widespread pain and fatigue.  Doc. No. 9, pp. 14-15.  But she does not challenge the ALJ's finding that she did not meet the criteria described in SSR 12-2p because she did not have at least 11 tender points upon physical exam, repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions, and that other disorders that could cause symptoms, signs, or co-occurring conditions had not been excluded.  Thus, the Court finds that Mencke has not shown that the ALJ erred when he found that fibromyalgia was not a medically determinable impairment.

### 3.  Evaluation of symptoms

Mencke argues that the ALJ failed to consider her complaints of pain and fatigue.  Doc. No. 9, pp. 15-16.  She asserts, "Mencke testified that during the relevant period of time she could stand no more than twenty minutes without breaks," her breaks would need to last one hour, and she would get fatigued "very easily" from walking, standing and sitting.  Doc. No. 9, pp. 15-16 (citing Tr. 1711-1712).  But the ALJ considered her allegations that she was unable to sit, stand, or walk for long periods and needed breaks.  Tr. 1685-1686.  He detailed objective exam findings in the record and concluded,

> Thus, aside from a few findings of pain with palpation and range of motion in the cervical spine, shoulders, lumbar spine, and knees, only slightly reduced strength in the hips and upper extremities on a few occasions, few reports of reduced sensation, and two notations related to gait, she was unremarkable as to gait, strength, sensation, reflexes, edema, and otherwise throughout. These findings are not entirely consistent with the claimant's allegations of significant limitations with standing, walking, sitting, and use of her upper extremities.

Tr. 1686.  Mencke does not challenge the ALJ's characterization of that evidence or his conclusion.  The Court finds that she has not shown that the ALJ erred when he evaluated her symptoms.

### 4.  Assistive device

Mencke argues that the ALJ's finding that an assistive device was not medically necessary "is contrary to the medical evidence from the medical providers that Mencke was utilizing a cane as early as April 2018."  Doc. No. 9, p. 16.  "[T]he Sixth Circuit has held that if a cane is not a necessary device for

17

the claimant's use, it cannot be considered a restriction or limitation on the plaintiff's ability to work." *Murphy v. Astrue*, 2013 WL 829316, at *10 (M.D.Tenn. March 6, 2013) (citing *Carreon v. Massanari*, 51 Fed. App'x 571, 575 (6th Cir. 2002)); *Cruz-Ridol Carreon v. Comm'r of Soc. Sec.*, 2018 WL 1136119, at *15 (N.D.Ohio Feb. 12, 2018).[6]  To be considered a restriction or limitation, a cane "must be so necessary that it would trigger an obligation on the part of the Agency to conclude that the cane is medically necessary," *i.e.*, the record must reflect "more than just a subjective desire on the part of the plaintiff as to the use of a cane." *Murphy*, 2013 WL 829316, at *10 (internal citations omitted).  "If the ALJ does not find that such device would be medically necessary, then the ALJ is not required to pose a hypothetical to the VE." *Id*.  In general, an ALJ's finding that a cane or other assistive device is not medically necessary is error when the claimant has been prescribed an assistive device and the ALJ did not include the use of the device in the RFC assessment without providing an explanation for the omission. *Cruz-Ridolfi*, 2018 WL 1136119, at *15 (citing *Watkins v. Comm'r of Soc. Sec.*, 2017 WL 6419350, at *11 (N.D. Ohio Nov. 22, 2017)); SSR 96-9P, 1996 WL 374185, at *7 (July 2, 1996) ("To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)").

Mencke does not identify evidence showing that she was prescribed an assistive device prior to August 12, 2019.  She argues that she was observed to have used a cane "as early as April 2018" (Doc. No. 9, pp. 16, 19) but that is not proof a cane was medically necessary. *Murphy*, 2013 WL 829316, at *10 (the record must reflect more than a claimant's subjective desire to use a cane).  She asserts that because she was prescribed an assistive device on August 12, 2019 (when the ALJ determined that her disability began), it follows that she needed a cane prior to August 12, 2019.  Doc. No. 14, p. 3.  But the

---

[6] Report and recommendation adopted, 2018 WL 1083252.

ALJ found otherwise, and Mencke does not describe how the ALJ's reasoning was erroneous.

In support of her argument, Mencke cites *Turk v. Comm'r of Soc. Sec.*, 2021 WL 6755002, at *12 (N.D. Ohio Dec. 23, 2021),[7] in support.  Doc. No. 9, p. 20.  In *Turk*, the court found that the ALJ erred when finding a cane was not medically necessary because the consultative examiner stated that the claimant needed a cane for balance and the ALJ observed, at the hearing, that the claimant needed to use both hands to raise himself from a seated position and "required the use of a cane for balance while standing." 2021 WL 6755002, at *12.  Mencke's assertion—that she used a cane in April 2018—does not align with the facts in *Turk*.  She also cites *Pahanish v. Comm'r of Soc. Sec.*, 2019 WL 480992, at *3 (N.D. Ohio Feb. 7, 2019), which is not on point, either.  In *Pahanish*, the claimant identified two medical professionals who evaluated him and opined that he needed a cane for support.  Here, Mencke has not identified a provider who opined that she needed a cane during the relevant period.[8] *See also* SSR 96-9P, 1996 WL 374185, at *7 ("To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)").

The Court finds that Mencke has not shown that the ALJ's conclusion regarding the use of an assistive device is error.

### 5. Treating source opinion

Mencke argues that the ALJ erred when he evaluated the opinion of her treating physician, Dr. Alhaddad.  Doc. No. 9, pp. 17-18; Doc. No. 14, pp. 3-4.  The ALJ noted that Dr. Alhaddad's opinion

---

[7] Report and recommendation adopted, 2022 WL 280454 (N.D. Ohio Jan. 31, 2022).

[8] Mencke does not cite opinion evidence in support of her argument that the ALJ erred when he found that a cane was not medically necessary.  The Court notes that, in 2021, Dr. Alhaddad opined that Mencke needed a cane.  Tr. 1886.  But, as the ALJ found, that opinion did not state what time period it covered.  Moreover, Dr. Alhaddad did not answer the question on the form asking whether Mencke needed a cane for standing and/or walking and whether she needed it all the time.  *See* SSR 96-9P, 1996 WL 374185, at *7.

was dated September 17, 2021, and gave it "little" weight:

> He opined that the claimant would be absent 4+ days per month; she would be off-task 25% or more per day; she can occasionally lift 10 pounds and never more; she requires an assistive device; she would require 1-2 unscheduled breaks per day; and she can sit 4 hours and stand/walk 2 hours total (B22F/1-4). …. The record does not support Dr. Alhaddad's opinion as to limitation on exertion, off-task behavior, and absenteeism. The opinion is extreme and disproportionate to the exam findings throughout the record. Dr. Alhaddad noted treating the claimant since 2018; however, he did not relate the limitations to any specific date. I note that the opinion significantly post-dates the relevant period. Most importantly, the claimant's exam findings during the relevant period do not suggest any significant limitations with use of her dominant upper extremity, standing, walking, need for a cane, or findings that would be consistent with off-task and absenteeism as he suggest[s]. On December 16, 2016, she denied chronic back pain, neck pain, sore muscles, breathing issues, and symptoms in all other body systems (B6F/4). On exam, her BMI was 36.6; she was well-nourished; she had no physical deformities; she had no abdominal tenderness; and her gait and station were normal (B6F/4-5). On May 11, 2017, the claimant had pain with range of motion of the cervical and lumbar spine; she had tenderness to palpation of the cervical and shoulder muscles; she had 4-5/5 strength in all upper extremity muscle groups; she had less sensation in the left side of the right forearm but otherwise had normal sensation in the upper and lower extremities; her reflexes were unremarkable throughout; she had some difficulty going from sitting to standing; and she had a wide-based gait (B7F/5). Her exam was substantially similar on August 1, 2017 (B7F/45). On June 8, 2017, the claimant had full 5/5 strength in the upper and lower extremities; her breathing was normal; and she was otherwise unremarkable throughout (B7F/12). On August 11, 2017, she was unremarkable as to range of motion, edema, tenderness, orientation, and behavior (B9F/25). Her exams were substantially similar on August 25, 2017 (B9F/21), September 22, 2017 (B9F/17), June 29, 2018 (B13F/41), October 2, 2018 (B13F/57), January 3, 2019 (B13F/75), and April 4, 2019 (B13F/93).
>
> On September 19, 2017, the claimant was able to ambulate without an assistive device; she had normal tone, strength, and sensation; she had negative straight leg raise testing; she had tenderness in the lumbar, neck, and trapezius muscles, with full range of motion; and she was otherwise unremarkable throughout (B10F/5). Her exams were substantially similar on October 10, 2017 (B10F/23) and April 10, 2018 (B16F/40). On June 28, 2018, her gait and station were normal (B11F/4). On March 22, 2018, her gait was antalgic; her range of motion was normal; she had no edema; and she was otherwise unremarkable throughout (B13F/28-29). On May 5, 2018, her BMI was 41; her motor strength and sensation were normal in the upper and lower extremities; she had no edema throughout; she had normal range of motion throughout and with no tenderness; and she had bilateral knee crepitus (B12F/23). On January 17, 2019, she had tenderness in the right lumbosacral area; and she was otherwise unremarkable throughout (B12F/18). On April 8, 2019, her BMI was 41, she was in no acute distress; her breathing was normal; her shoulder range of motion was normal; she had no synovitis of the hands or wrists; she had tenderness in the right lumbosacral area and right knee joint line; her hip range of motion was normal; and she was otherwise unremarkable throughout (B12F/7). Her exam was substantially similar on July 16, 2019, (B12F/5). At a physical therapy evaluation on August 9, 2019, she had some reduced strength with left hip abduction and adduction (4+/5), but was

otherwise had full strength (5/5) in the lower extremities; and she ambulated with a slow cautious gait with a straight cane (B14F/99-100). Thus, aside from a few findings of pain with palpation and range of motion in the cervical spine, shoulders, lumbar spine, and knees, only slightly reduced strength in the hips and upper extremities on a few occasions, few reports of reduced sensation, and two notations related to gait, she was unremarkable as to gait, strength, sensation, reflexes, edema, and otherwise throughout. These findings do not support and are inconsistent with Dr. Alhaddad's opinion as to limitations on lifting/carrying, standing, walking, the need for a cane, or findings that would be consistent with off-task and absenteeism as he suggest[s]. Thus, the opinion is given little weight.

Tr. 1689-1691.

Mencke recites her reports of symptoms at visits with Dr. Alhaddad, her diagnoses, and a physical therapy evaluation on August 9, 2019.  Doc. No. 9, pp. 18-19.  She writes, "contrary to the ALJ's conclusions, the treatment records supported Dr. Alhaddad's findings and recommendations.  The ALJ failed to adequately explain why he failed to consider this opinion which limited Mencke to less than the sedentary level of exertion."  Doc. No. 9, p. 19.  As an initial matter, the ALJ considered Dr. Alhaddad's opinion, as set forth above.  Next, Mencke avoids the ALJ's reasoning that Dr. Alhaddad's opinion "significantly post-dates the relevant period" and was completed two years after Mencke became disabled.  Finally, she does not challenge the ALJ's finding that her longitudinal, objective exam findings prior to August 12, 2019, did not support the severe restrictions in Dr. Alhaddad's September 17, 2021 opinion.  In short, she does not develop her argument that the ALJ "failed to explain why" he assigned "little" weight to Dr. Alhaddad's opinion.  Thus, the Court finds that Mencke's argument fails.

### 6.  Mental impairments at step 3

Mencke argues that the ALJ erred at step 3 when he evaluated her mental impairments under the paragraph B criteria.  Doc. No. 9, p. 21.  She writes, "In this matter, the ALJ found that even though she had short-term memory issues and reported limitations with completing tasks, she had reported in 2015 that she could watch television etc. (Tr. 1676-1680 citing 263-270).  These finding are contrary to the evidence as set forth above."  Doc. No. 9, p. 21 (following a page of Mencke reciting various mental

21

health exam evidence).  The Court finds that Mencke has waived this argument.  The ALJ spent four pages discussing the four paragraph B criteria—understanding, remembering, and applying information (moderate limitation); interacting with others (mild limitation); concentrating, persisting, and maintaining pace (moderate limitation); and adapting and managing herself (moderate limitation). Mencke does not identify what finding in which of the four categories she believes was in error. Moreover, the ALJ's reference to Mencke watching television was in the context of her function report, which the ALJ described:

> she has no problems for personal care; she performs "very well" her hobbies of watching television, reading, and helping her children with reading; she does not need reminders to go places; she follows written and spoken instructions "very well"; she also did not indicate difficulties with memory, concentration, understanding, or following instructions; she does not require special reminders for personal care; she prepares her own meals; she gets around all the time by walking and using public transportation; she shops in stores for all needs once or twice a month; and she is able to pay bills, count change, handle a savings account, and use a checkbook/money order.

Tr. 1677-1678 (citations to the record omitted).

Mencke contends that the ALJ's paragraph B finding "was an incorrect interpretation of the evidence as set forth above by the treating source and Dr. Griffiths.  Dr. Griffiths remarked that Mencke had performed poorly in the assessment for her short-term memory skills with her ability to mentally focus decreasing with pain."  Doc. No. 9, p. 22.  She does not identify what "treating source" she is referring to.  As for the opinion of the consultative examiner, Dr. Griffiths, the ALJ considered his evaluation when discussing the paragraph B criteria (Tr. 1676, 1677, 1678, 1679).  The ALJ also discussed his opinion later in his decision and assigned it "partial" weight, a finding that Mencke does not challenge.  Tr. 1691-1692.  Moreover, as the ALJ remarked, Dr. Griffiths found that Mencke could understand and follow simple instructions, which was "not inconsistent" with the ALJ's finding that Mencke had moderate limitations in understanding, remembering, concentrating, persisting, adapting, and managing oneself.  Tr. 1692.  In short, Mencke does not articulate her argument with respect to

22

errors she believed the ALJ made at step three.  Thus, the Court finds that she has not shown that the ALJ erred when he evaluated her mental impairments at step 3.

### 7.  Miscellaneous

In the last two pages of her brief, as a final salvo, Mencke throws out sweeping generalizations, cites a flurry of cases, and references her physical and mental impairments, all without identifying what portion of the ALJ's decision she is attacking.  Doc. No. 9, pp. 22-23.  Because Mencke has made no attempt to develop those purported arguments, the Court finds that she has waived them.

### VII. CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.


**IT IS SO ORDERED.**


Date: July 14, 2022                                        *s/ Jonathan Greenberg*
                                                           Jonathan D. Greenberg
                                                           United States Magistrate Judge

23